[No. H002346 Sixth Dist. Dec. 10, 1987.]

TRI COUNTY APARTMENT ASSOCIATION et al., Plaintiffs and Respondents, v.
CITY OF MOUNTAIN VIEW et al., Defendants and Appellants.

1284

COUNSEL

Robert J. Logan and Peter D. Bulens, City Attorney, for Defendants and Appellants.

Herman J. Mager and Stephen J. Vonderach for Plaintiffs and Respondents.

OPINION

STONE, J.*—In this case of first impression, we must decide whether a municipal ordinance restricting the effective date of proposed rental increases is a valid rent control measure or a prohibited trespass into landlord-tenant areas preempted by state law. Our task is to affix a label, with appropriate judicial consequences, to a Mountain View enactment formally identified as a "notification process for rental increases." Should the measure be classified as permissible control of residential *rent increases* (the position advocated by the city) or as an usurpation of the *notification* provisions set forth in Civil Code section 827 (the position advocated by a landowners' association)?

With full awareness that California cities are free to adopt various forms of rent control under broad constitutional tolerance (see *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 142 [130 Cal.Rptr. 465, 550 P.2d 1001]; *Carson Mobilehome Park Owners' Assn.* v. *City of Carson* (1983) 35 Cal.3d 184, 191 [197 Cal.Rptr. 284, 672 P.2d 1297]; *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 681 [209 Cal.Rptr. 682, 693 P.2d 261], affd. *Fisher* v. *Berkeley* (1986) 475 U.S. 260 [89 L.Ed.2d 206, 216-217, 106 S.Ct. 1045]; *Santa Monica Pines, Ltd.* v. *Rent Control Board* (1984) 35 Cal.3d 858, 868 [201 Cal.Rptr. 593, 679 P.2d 27] ; *Nash* v. *City of Santa Monica* (1984) 37 Cal.3d 97 [207 Cal.Rptr. 285, 688 P.2d 894] [superseded by Gov. Code, § 7060.7]; *Pennell* v. *City of San Jose* (1986) 42 Cal.3d 365, 371 [228 Cal.Rptr. 726, 721 P.2d 1111], hearing granted (Mar. 2, 1987) 480 U.S. 905 [94 L.Ed.2d 517, 107 S.Ct. 1346]), we have concluded that the Mountain View ordinance impermissibly conflicts with a statutory scheme which oc-

* Assigned by the Chairperson of the Judicial Council.

cupies the field of notice between landlords and tenants. The ordinance, therefore, is invalid.

## THE PROCEDURAL FRAMEWORK

Through an amended complaint filed in Santa Clara County Superior Court on February 13, 1986, the Tri County Apartment Association and two individual landlords, as plaintiffs, sought declaratory and injunctive relief from the City of Mountain View and its city attorney, as defendants. (The substance of the complaint will be discussed below.) In response, defendants filed a demurrer and, alternatively, a motion for judgment on the pleadings. Plaintiffs responded with their own motion for judgment on the pleadings, even though defendants had not yet answered the complaint.

At a hearing on the various requests for relief, the court expressed its concern about ruling for plaintiffs in the absence of defendants' answer. But counsel for both parties, to expedite the appellate process, stipulated that they waived procedural objections to the court's decision. The court then ruled in favor of plaintiffs on the theory that the disputed ordinance directly conflicted with state law. Following the entry of judgment declaring the ordinance unconstitutional and permanently enjoining its enforcement, defendants filed a timely notice of appeal.

■ The issue is properly before us. (See *Palos Verdes Shores Mobile Estates, Ltd.* v. *City of Los Angeles* (1983) 142 Cal.App.3d 362, 368 [190 Cal.Rptr. 866] ["Since the determination of the facial validity of an ordinance presents an issue of law, it is appropriate that the issue be settled on an appeal from an order granting a preliminary injunction enjoining the ordinance's enforcement"].)

## THE FACTS[1]

The Mountain View City Council, in 1984, formed an ad hoc committee to investigate landlord-tenant relationships in that municipality, whose residents had twice defeated rent control measures in local elections. Instructed not to consider rent control per se, the committee recommended an ordinance to alleviate problems purportedly created by Civil Code section 827 (Section 827), which allows landlords to increase rents for month to month tenants on not less than 30 days' notice.[2] By a 4-3 vote on November 19,

---

[1] Since both parties have agreed that no material facts are in dispute for purposes of this appeal, we have drawn our factual background from the pleadings, motions, and memoranda filed in the trial court.

[2] The full text of Section 827 is as follows: "In all leases of lands or tenements, or of any interest therein, from week to week, month to month, or other period less than a month, the

1985, the city council adopted the committee's recommendation as Municipal Ordinance No. 27.85 (the Ordinance),[3] to become effective on January

---

landlord may, upon giving notice in writing to the tenant, in the manner prescribed by Section 1162 of the Code of Civil Procedure, change the terms of the lease to take effect, as to tenancies for less than one month, upon the expiration of a period at least as long as the term of the hiring itself, and, as to tenancies from month to month, to take effect at the expiration of not less than 30 days, but if such change takes effect within a rental term, the rent accruing from the first day of such term to the date of such change shall be computed at the rental rate which obtained immediately prior to such change; provided, however, that it shall be competent for the parties to provide by an agreement in writing that a notice changing the terms thereof may be given at any time not less than seven days before the expiration of a term, to be effective upon the expiration of such term. [¶] The notice, when served upon the tenant, shall of itself operate and be effectual to create and establish, as a part of the lease, the terms, rents, and conditions specified in the notice, if the tenant shall continue to hold the premises after said notice takes effect."

[3] The full text of the Ordinance is as follows: "ORDINANCE NO. 27.85 [¶] AN ORDINANCE ADDING ARTICLE III TO CHAPTER 21 OF THE MOUNTAIN VIEW CITY CODE, ALL RELATING TO THE NOTIFICATION PROCESS FOR RENTAL INCREASES [¶] WHEREAS, the City of Mountain View has over 60 percent multi-family dwellings and 63 percent rental units; and [¶] WHEREAS, historically, the City has experienced very low vacancy rates compared with other areas in the State; and [¶] WHEREAS, rental increases frequently create an immediate burden upon the tenant to either find another less expensive rental unit immediately or find a way to pay the increased rent; and [¶] WHEREAS, immediately available substitute housing is often very difficult to find; and [¶] WHEREAS most tenants are notified of an increased rent no more than thirty (30) days prior to such an increase; and [¶] WHEREAS, such a short time makes it extremely difficult to make the necessary adjustments to such a rental increase and causes significant disruption in the community. [¶] NOW, THEREFORE, BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF MOUNTAIN VIEW AS FOLLOWS: [¶] *Section I.* Chapter 21, Article III of the Mountain View City Code is hereby added, to read as follows:

" 'ARTICLE III. NOTIFICATION OF RENTAL INCREASES. [¶] SEC. 21.56. *Rental increase notification.* [¶] In any residential rental tenancy of a dwelling unit from month to month or longer, the landlord shall be required to give the tenant at least sixty (60) days' written notification of any rental increase prior to such increase going into effect. [¶] SEC. 21.57. *Provisions of written rental agreement.* [¶] In any written residential rental agreement from month to month or longer, the provisions of Sec. 21.56 requiring at least a sixty (60) day prior notification of a rent increase shall be included in such an agreement. [¶] SEC. 21.58. *Defenses to unlawful detainer actions.* [¶] a. In any action brought by a landlord seeking the recovery or possession of a residential rental unit on the basis of a failure by the tenant to pay a rent increase or for the recovery of rent in the form of a rent increase, the failure of the landlord to comply with the provisions of Sec. 21.56 shall act as a defense to such action. [¶] b. The provisions of this Article III shall not affect the ability of a landlord to remove a tenant from possession of the property except for the failure to comply with Section 21.56. [¶] SEC. 21.59. *Penalties.* [¶] Any person who violates Sec. 21.56 or 21.57 of this code shall be guilty of an infraction punishable by: [¶] a. A fine not exceeding $100 for a first violation. [¶] b. A fine not exceeding $200 for a second violation within one year. [¶] c. A fine not exceeding $300 for a third and any additional violations within one year.' [¶] *Section 2.* The provisions of this ordinance shall be effective sixty (60) days from and after the date of its adoption. [¶] *Section 3.* If any section, subsection, sentence, clause or phrase of this ordinance is for any reason held to be unconstitutional, such decision shall not affect the validity of the other remaining portions of this ordinance. The City Council hereby declares that it would have passed this ordinance and each section, subsection, sentence, clause or phrase thereof, irrespective of the fact

11, 1986, with the following title: "AN ORDINANCE ADDING ARTICLE III TO CHAPTER 21 OF THE MOUNTAIN VIEW CITY CODE, *ALL RELATING TO THE NOTIFICATION PROCESS FOR RENTAL INCREASES."* (Italics added.)

The preamble recites that Mountain View had more than 60 percent multi-family dwellings and 63 percent rental units, with low vacancy rates. Rental increases frequently created immediate burdens on a tenant either to find a way to pay the increased rent or to find another, less expensive unit immediately, although available substitute housing was often difficult to obtain. The short notice period made it difficult for tenants to adjust to the increase and caused significant community disruption.

As a result, the city council ordained a procedure for "NOTIFICATION OF RENTAL INCREASES," the most significant part of which says that: "In any residential rental tenancy of a dwelling unit from month to month or longer, the landlord shall be required to give the tenant at least sixty (60) days' written notification of any rental increase prior to such increase going into effect."

The difference between Section 827 and the Ordinance is the minimum notification period, 30 days versus 60 days, which a landlord must observe before increasing a monthly tenant's rent.

If a landlord failed to obey the Ordinance, an aggrieved tenant could use that failure as a defense in an unlawful detainer action. The landlord's

that any one or more sections, subsections, sentences, clauses or phrases be declared unconstitutional. [¶] *Section 4.* Pursuant to Section 522 of the Mountain View City Charter, it is ordered that copies of the foregoing proposed ordinance be posted at least two (2) days prior to its adoption in three (3) prominent places in the City and that a single publication be made to the official newspaper of the City of a notice setting for the title of the ordinance, the date of its introduction, and a list of the places where copies of the proposed ordinance are posted. [¶] – – – – – – – – – – [¶] The foregoing ordinance was regularly introduced at the Adjourned Regular Meeting of the City Council of the City of Mountain View, duly held on the 29th day of October, and thereafter adopted at the Regular Meeting of said Council, duly held on the 19th day of November, by the following roll call vote: [¶] AYES: Councilmembers Freelen, Perry, Switick, and Mayor Zesch [¶] NOES: Councilmembers Figueroa, Heppler, and Schatz [¶] ABSENT: None [¶] NOT VOTING: None

"ATTEST APPROVED

"

"CATHERINE L. JANSEN JAMES C. ZESCH
"DEPUTY CITY CLERK MAYOR

"PDB/ATY
"1107-9-30"

conduct also amounted to an infraction, punishable by a fine of not more than $300 for three or more violations within one year.

Before the city began to enforce the Ordinance, plaintiffs filed the present litigation, alleging the enactment's unconstitutionality because of state preemption.

## PLAINTIFFS' CONTENTIONS

From the plaintiffs' perspective, the Ordinance encroaches on an area fully occupied by general law under Section 827, i.e., "the limited field of notice required when a landlord proposes to change the terms of the letting." Plaintiffs concede that under prevailing case law authority, "if the City of Mountain View chose to enact rent control measures and did so properly and according to law, their [i.e., the landlords'] ability to prevent such an enactment would be limited to lobbying efforts before the people and City Council and by campaign against enactment of such measures at the ballot box." Yet the present issue, say plaintiffs, is different from rent control; the issue is limited to a landlord's right to change the lease terms on statutorily authorized notice, which Section 827 governs. "Were this Court to now hold Ordinance 27.85 as being a valid rent control measure, not only would ten years of decisional case law be undermined, but utter chaos would result in the rental housing industry." To the plaintiffs, the only question is: "In the absence of a valid rent control ordinance, can a local government invade an area pre-empted by the state legislature?"

## DEFENDANTS' CONTENTIONS

The defendants ask a different question, i.e., "As a valid rent control measure, is Mountain View Ordinance No. 27.85 preempted by Civil Code § 827?" The city's arguments against preemption fall into several categories which contend that the statute and the Ordinance are compatible but, if not, that the Ordinance deals with a proper subject of local control:

1. *Presumption of Validity.* The landowners' interpretation of the Ordinance is that it improperly affects the terms of certain tenancies by changing the statutory notice provisions; the city's interpretation is that the notice provision is a proper method of temporarily stabilizing rents. Under these circumstances, the Ordinance should be considered valid. "Even if there are two reasonable interpretations, the one which supports the constitutionality should be upheld."

2. *Motive.* Although the city council instructed its committee not to consider rent control, that circumstance may not benefit plaintiffs because

(a) directions given to a committee two years before the Ordinance was passed do not establish the council's motive or intent; and (b) motive or intent on the council members' part is irrelevant. The official legislative intent was expressed in the recitals set forth in the Ordinance.

3. *Permissiveness.* If the Ordinance is deemed to be a notice requirement, it is still not preempted. "The language of Civil Code § 827 is permissive. Supplemental local regulation is permissible." The Ordinance and Section 827 use the term "notice" for significantly different purposes. "The Ordinance and Civil Code § 827 are actually complementary. Respondents simply have to give two notices, or combine both in one which fulfills the requirements of the Ordinance, as well as Civil Code § 827. The 60 day notice gives the warning and commences the rent stabilization period, the 30 day notice effectuates the change in those leases of month-to-month, to which both the Ordinance and Civil Code apply." Except for month-to-month tenancies, the Ordinance and Section 827 affect different tenancies.

4. *Rent Control as a Subject of Local Regulation.* Since the Ordinance limited a landlord's right to increase rent for a given period, it was a rent control measure properly subject to local regulation. "Setting a ceiling on the amount of rent that can be charged for a limited period of time, is by any definition, rent control." The subject has not been fully occupied by general law. "Insofar as the relevant field involved here is rent control, or more broadly speaking, landlord/tenant relations, the state has not evinced a paramount concern which will not tolerate further or additional local action."

The statute and the Ordinance are distinguishable. Section 827 does not stabilize rent but does address the amount of notice a landlord must give to change the terms of certain tenancies. By contrast, the Ordinance stabilizes rent, with notice a way of implementing that purpose. "Although different in approach, Mountain View's stabilization of rent for a specified period of time is no different than other rent control provisions throughout the State of California."

"If the Ordinance stated that no rent increase will go into effect for at least 60 days after a period of time in which the landlord determines to increase the rent, this matter would not be here today. By removing the 'notice' language, the intent of the provision is more evident. Although the form of the language changes, the substance remains the same. The City of Mountain View has placed a 60 day ceiling on increasing any existing rents."

ANALYSIS

*1. Characterizing the Ordinance*

 Cities are afforded flexibility in establishing residential rent control programs. "Rent control agencies are not obliged by either the state or federal Constitution to fix rents by application of any particular method or formula. . . . The method of regulating prices is immaterial so long as the result achieved is constitutionally acceptable." (*Carson Mobilehome Park Owners' Assn.* v. *City of Carson, supra,* 35 Cal.3d 184, 191; see also *Nash* v. *City of Santa Monica, supra,* 37 Cal.3d at p. 100; *Fisher* v. *City of Berkeley, supra,* 37 Cal.3d at p. 680; *Pennell* v. *City of San Jose, supra,* 42 Cal.3d at pp. 370-371, fn. 7; *Cotati Alliance for Better Housing* v. *City of Cotati* (1983) 148 Cal.App.3d 280, 294 [195 Cal.Rptr. 825].) Consistent with this diversity, Mountain View would like us to place the Ordinance in a rent control framework.

Urging us to characterize "notification" as a rent control device, and thus a valid exercise of local police power, the city has argued that we must pay no attention to the fact that Mountain View voters twice defeated rent control measures and that the committee which recommended the Ordinance did so under instructions not to consider rent control. As authority for its position the city states, correctly, that inquiry into the council members' motives is impermissible. But the city then concludes, incorrectly, that this principle bars us from examining the history of the Ordinance.

 The authorities relied on by the city stand for the proposition that a litigant may not, through discovery proceedings, directly question local legislators about their mental processes or their reasons for enacting an ordinance. (See *County of Los Angeles* v. *Superior Court* (1975) 13 Cal.3d 721, 729 [119 Cal.Rptr. 631, 532 P.2d 495]; *City of Fairfield* v. *Superior Court* (1975) 14 Cal.3d 768, 772 [122 Cal.Rptr. 543, 537 P.2d 375].)

By contrast, the setting in which legislation was adopted well may be helpful in interpreting the language used in the enactment. (See *Rue-Ell Enterprises, Inc.* v. *City of Berkeley* (1983) 147 Cal.App.3d 81, 89 [194 Cal.Rptr. 919]; *Gregory* v. *City of San Juan Capistrano* (1983) 142 Cal.App.3d 72, 81 [191 Cal.Rptr. 47] ["The language used must be the primary basis for construction of a statute and no assumption as to its effect mentioned in bill digests or analyses which is not warranted by its language can change the plain meaning of the language used"]; *Kriz* v. *Taylor* (1979) 92 Cal.App.3d 302, 313 [154 Cal.Rptr. 824]; *Madsen* v. *Oakland Unified*

*Sch. Dist.* (1975) 45 Cal.App.3d 574, 580 [119 Cal.Rptr. 531]; *People* v. *Mason* (1968) 261 Cal.App.2d 348, 352 [68 Cal.Rptr. 17].)

We recognize the rule that "Statutory language must be read in context, keeping in mind the nature and purpose of the enactment, and must be given such interpretation as will promote rather than defeat the objective of the law." (*Terminal Plaza Corp.* v. *City and County of San Francisco* (1986) 177 Cal.App.3d 892, 900 [223 Cal.Rptr. 379].) Here, we cannot ignore the history of the Ordinance to devise an interpretation which its own draftsmen failed to put into explicit language. For what the record suggests were political, rather than linguistic, reasons, the Mountain View City Council majority voted to support an ordinance which nowhere uses the words "rent control." Instead, the Ordinance focuses on the subject of "notification," apparently in deference to citywide opposition to previous rent control campaigns.

 Relying on the very language which the city council has utilized, we conclude that the Ordinance deals directly and unequivocally with the subject of *when* a landlord must notify a tenant about a rent increase, i.e., at least 60 days before the increase is scheduled to become effective. The time of notification, not the amount of the increase, is the subject of the Ordinance. (Civ. Code, §§ 1947.7 and 1947.8, which were added in 1986, after the Ordinance was enacted, illustrate the type of municipal legislation which is viewed as local rent control; the administrative structures described there differ materially from the notification procedures adopted by the Ordinance. See also Civ. Code, § 798 et seq. for the Mobilehome Residency Law as another indication of how rent controls may be articulated.) Therefore, we conclude that the Ordinance deals with notification, not rent control.

Our inquiry must therefore determine whether the Legislature has preempted the field of notification in landlord-tenant relationships.

### 2. The Controlling Principles

 A city such as Mountain View may "make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7.) But local legislation in conflict with general law is void. Conflicts exist if the ordinance duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication. Within a fully occupied area, there is no room for supplementary or complementary local legislation, even if the subject could otherwise be characterized as a municipal affair. (*People* ex

rel. *Deukmejian* v. *County of Mendocino* (1984) 36 Cal.3d 476, 484 [204 Cal.Rptr. 897, 683 P.2d 1150]; see also *Candid Enterprises, Inc.* v. *Grossmont Union High School Dist.* (1985) 39 Cal.3d 878, 885 [218 Cal.Rptr. 303, 705 P.2d 876].)

"A local municipal ordinance is invalid if it attempts to impose additional requirements in a field that is preempted by the general law. . . . [¶] Whenever the Legislature has seen fit to adopt a general scheme for the regulation of a particular subject, the entire control over whatever phases of the subject are covered by state legislation ceases as far as local legislation is concerned. . . . [¶] In determining whether the Legislature intended to occupy a particular field to the exclusion of all local regulation, we may look to the 'whole purpose and scope of the legislative scheme' and are not required to find such an intent solely in the language used in the statute." (*In re Lane* (1962) 58 Cal.2d 99, 102-103 [22 Cal.Rptr. 857, 372 P.2d 897].)

The pervasive question to be answered is: Does the demand for uniformity throughout the state outweigh the needs of local governments to handle problems peculiar to their communities? (*Robins* v. *County of Los Angeles* (1966) 248 Cal.App.2d 1, 9 [56 Cal.Rptr. 853]; *Peopl* v. *Deacon* (1978) 87 Cal.App.3d Supp. 29, 32 [151 Cal.Rptr. 277].)

### 3. The Flexibility of the Principles

Determining whether a conflict exists may well depend on the terminology employed in the analysis. "How the relevant field occupied by the allegedly preemptive state legislation is defined is often crucial to the result." (*Candid Enterprises Inc.* v. *Grossmont Union High School Dist., supra,* 39 Cal.3d at p. 886, fn. 4.) "A field cannot properly consist of statutes unified by a single common noun." (*Galvan* v. *Superior Court* (1969) 70 Cal.2d 851, 862 [76 Cal.Rptr. 642, 452 P.2d 930].)

As observed in *California Water & Telephone Co.* v. *County of Los Angeles* (1967) 253 Cal.App.2d 16, 27-28 [61 Cal.Rptr. 618]: "No exact formula exists upon which to forecast precisely the application of implied legislative preemption. One of the clouds in the crystal ball is the definition of the field which may be ultimately adopted in any particular case. If the definition is narrow, preemption is circumscribed; if it is broad, the sweep of preemption is expanded. For example, the Supreme Court defined the subject matter of the legislation considered in the *Hubbard* case, not as 'all gambling,' but only as those forms of gambling expressly enumerated by section 330 of the Penal Code, thus permitting local supplementary legislation in respect of other forms of gaming. But in the *Lane* case, the field was broadly defined

as 'the criminal aspects of sexual activity,' thus encompassing a very wide range of legislation previously assumed to be outside the area covered by general law." (Fns. omitted; see also *Gregory* v. *City of San Juan Capistrano, supra,* 142 Cal.App.3d at p. 84 ["As always in considering a claim of preemption by implication, the question is what is the relevant 'field' "].)

### 4. *Tests of Preemption*

■ A claim of preemption must be tested against two separate concepts, according to *In re Hubbard* (1964) 62 Cal.2d 119, 124 [41 Cal.Rptr. 393, 396 P.2d 809] (overruled on another point by *Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 63 [81 Cal.Rptr. 465, 460 P.2d 137]):

(a) Is there a "conflict" between the city ordinance and the general laws, as that term is used in California Constitution, article XI, section 7 (formerly art. XI, § 11)?

(b) To what extent is a charter city relying on its allegedly exclusive power to make and enforce all laws and regulations for municipal affairs?

Arising in different ways, *conflicts* with general laws may grow out of the exact language of the state and municipal laws, or from a local attempt to impose additional requirements in a field that is preempted by the general law, or from the state's adoption of a general scheme for the regulation of a particular subject. But if the state's preemption of the field is not complete, local supplemental legislation may be valid to the extent that it covers phases of the subject which have not been covered by the state law. (*In re Martin* (1963) 221 Cal.App.2d 14, 17 [34 Cal.Rptr. 299].) "By limiting the general statutes to regulation or prohibition of specifically enumerated activities, the Legislature did not intend to prevent local authority from legislating on those subjects in regard to which the former are silent." (*In re Hubbard, supra,* 62 Cal.2d at p. 127.)

Chartered cities have full power to legislate on *municipal affairs* unless: "(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the municipality." (*In re Hubbard,*

*supra,* 62 Cal.2d at p. 128; see also *Fisher* v. *City of Berkeley, supra,* 37 Cal.3d at p. 708.)

"The test is the breadth of the area which the Legislature sought to preempt by its own comprehensive scheme of regulation." (*Robillwayne Corp.* v. *City of Los Angeles* (1966) 241 Cal.App.2d 57, 61 [50 Cal.Rptr. 1].) But: "To approach the issue of preemption as a quantitative problem provides no guidance in determining whether the Legislature intends that local units shall not legislate concerning a particular subject, and further confounds a meaningful solution to preemption problems by offering a superficially attractive rule of preemption that requires only a statutory nose-count. . . . [¶] The task is, as shown in *Hubbard,* to determine whether the state has occupied a relevant field—an area of legislation which includes the subject of the local legislation, and is sufficiently logically related so that a court, or a local legislative body, can detect a patterned approach to the subject." (*Galvan* v. *Superior Court, supra,* 70 Cal.2d at pp. 861-862.)

Here, the concept of a "patterned approach" is a most persuasive factor in our quest for a proper decision.

### 5. Statutory Timetables in Landlord-Tenant Relationships

■ Landlord-tenant relationships are so much affected by statutory timetables governing the parties' respective rights and obligations that a "patterned approach" by the Legislature appears clear. Unlike the eviction restrictions which were distinguished from unlawful detainer procedures in *Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d at p. 149; *Fisher* v. *City of Berkeley, supra,* 37 Cal.3d at p. 706; and *Gross* v. *Superior Court* (1985) 171 Cal.App.3d 265 [217 Cal.Rptr. 284], the Ordinance here adopts the same purpose as the statute, i.e., appropriate notification, but then changes the statewide chronology to suit its own agenda.

Section 827, which is most directly challenged by the Mountain View Ordinance, provides that in all leases of lands or tenements, from week to week, month to month, or other period of less than a month, the landlord may give written notice to the tenant to change the terms of the lease. The changes are to take effect according to a specified schedule: (a) tenancies for less than one month, on the expiration of a period at least as long as the hiring itself; (b) tenancies from month to month, at the expiration of not less than 30 days.

If a change in terms takes effect within a rental term, the rent accruing from the first day of the term to the date of the change must be computed at

the rental rate existing immediately before the change. Through a written agreement, the parties may provide that the notice may be given at any time not less than seven days before the term expires, to become effective on expiration.

The statute thus specifies not only a time for notice to tenants, but also prohibits the parties from agreeing to a shorter notice than another specified period. With unambiguous language, the Legislature has asserted its control over landlord-tenant notification procedures.

What is more, Section 827 represents only one part of the legislative expression about when landlords and tenants may assert their rights and must meet their obligations.

Code of Civil Procedure sections 1161 et seq. detail the chronology for unlawful detainer actions.

Civil Code sections 789 et seq. deal with the termination of estates, including the "not less than thirty days" of notice to be given to terminate a tenancy at will (Civ. Code, §§ 789, 790) and the "three days' notice" for re-entry under grants or leases (Civ. Code, § 791).

Civil Code sections 1925 et seq. cover the subject of "hiring," i.e., the contract by which one person gives another person the temporary possession and use of property, other than money for reward, with an agreement that the property will be returned in the future.

Civil Code sections 1940 et seq. deal with hiring of real property, with many sections specifying the timing of various acts within the landlord-tenant relationship. (See, e.g., Civ. Code, § 1942 [if a tenant repairs his premises "after the 30th day following notice" of deficiencies, he is presumed to have acted after a reasonable time]; Civ. Code, § 1942.3 [in an unlawful detainer action, rebuttable presumptions exist against the landlord if he has failed to abate habitability defects "60 days beyond the date" a notice was issued]; Civ. Code, § 1942.4 [a landlord may be liable in damages for failing to abate habitability defects "60 days beyond the date" a notice was issued]; Civ. Code, § 1942.5 [if a landlord improperly retaliates against a tenant paid-up in his rent, the landlord may not recover possession, cause an involuntary quitting, increase the rent or decrease services "within 180 days" of specified occurrences]; Civ. Code, § 1944 [a residential hiring at a monthly rate of rent for an unspecified term is presumed to be for "one month"; in the absence of an agreement as to length of time or rent, the hiring is presumed to be "monthly"]; Civ. Code, § 1945 [if a lessee remains

in possession after the hiring has expired, and the lessor accepts rent from him, the hiring is presumed renewed on the same terms and for the same time, "not exceeding one month when the rent is payable monthly"]; Civ. Code, § 1946 [a notice of intention to terminate a tenancy from month to month may be given by either party with "at least 30 days' written notice," although the parties may agree to a lesser period under specified conditions]; Civ. Code, § 1950.5 [security deposits to a landlord ordinarily may not exceed "an amount equal to two months' rent, in the case of unfurnished residential property, and an amount equal to three months' rent in the case of furnished residential property, in addition to any rent for the first month paid on or before initial occupancy"; not later than "two weeks after the tenant has vacated the premises," the landlord must account for the security deposit]; Civ. Code, § 1951.3 [a lessor may take steps to have property deemed abandoned if the rent was due and unpaid for "at least 14 consecutive days"]; Civ. Code, § 1951.7 [a payment that is "not in excess of the amount of one month's rent" is not considered an advance payment].)

Despite the city's contention that Section 827 is a permissive statute which can tolerate the complementary effect of the Ordinance, the extensive scheduling provided by the Legislature reveals that the timing of landlord-tenant transactions is a matter of statewide concern not amenable to local variations. The Ordinance directly conflicts with the legislative scheme.

## CONCLUSION

We conclude that the Mountain View Ordinance impermissibly conflicts with statewide legislation by invading an area preempted by the Legislature. The Ordinance is therefore invalid.

Judgment affirmed.

Agliano, P. J., Brauer, J., concurred.

Appellants' petition for review by the Supreme Court was denied March 17, 1988.